this morning in number 22973, Oliver v. D'Amico. Ms. Oliver. Yes, sir. I might go ahead. Whenever you're ready. Thank you, sir. I'd like to start out by saying I'm asking this court to please read my brief. Please read the affirmation that's contained within my special appendix number one. It outlines numerous legal errors, procedural violations that denied me the opportunity to fully and fairly litigate my claims. Nothing was heard after my forced transfer to Troop A. The judge refused. After my forced transfer to Troop A is when Defendant Martin McKee and Defendant Steven Negrelli and their co-defendants filed false statements and presented false sworn testimony against me that resulted in my illegal termination from the New York State Police. I was credited with 19 years and four months of service. I gave this agency my life. And yet, if you look at Steven Negrelli's sworn testimony under special appendix 18, he testifies under oath that I had no operational duties, that I was strictly assigned to an information sharing unit. And I disobeyed him when I provided a simple transport in May of 2014. He lied under oath. And if you look at special appendix number 10, you will see all the operational duties I performed as a member of Troop A's CTIU at the direction of Steven Negrelli and co-defendants Michael Ceretto and Gerald Kopasz. I performed the same duties I performed in the narcotics unit, but they forced me to withhold those documents. They were never documented or cited anywhere. In 2018, I filed a motion for injunctive relief after I obtained a sworn deposition from the former superintendent as the final arbiter. He admitted he never conducted an independent review. He never looked at the transcript. He signed off on my termination just because Thomas Capisa handed him the document to sign. I was never allowed to argue this. The appellate court never heard it. They believe Joseph D'Amico conducted the duties he was required to perform. As indicated on my notice of termination, he admitted under sworn deposition he never did that. I lost my opportunity. No retaliation claims, no discrimination claims were ever heard in my case. I can prove that they lied. I have sworn depositions. I've impeached their testimony. I have falsified statements. And when I filed for injunctive relief, the district judge dismissed my motion, insisting based on what the defendants wanted that this was all, there was no irreparable harm. The judge said irreparable harm or reparation can be obtained through money damages. Nowhere in her decision does she cite the contradiction between Stephen Negrelli's testimony and my duties. It was a complete contradiction, and yet she doesn't cite it. Two years later, she files an undated decision and order in response to motions for summary judgment. Nowhere again does she put anything about Stephen Negrelli's false sworn testimony that was contradicted by the 50 plus pages of documents I gave her over and over. By not putting it in there, she could pretend that it didn't exist. And in fact, in her undated decision, dated April 27th, 2020, it says plaintiff has produced no evidence that there's any proof that this was retaliatory. So could I ask, even if he misrepresented your duties, does that show that your termination was retaliatory? Yes, sir. And the appellate court's decision, they wrote plaintiff petitioner disobeying a directive and lying to IAB and creating a false record does not shock one's sense of, as though it's kind of cookie-cutted. I think they use that in a lot of decisions, but that's why I was terminated for disobeying Stephen Negrelli when I provided a transport. They held that by not taking the documents. So that's not about your duties. You're saying that you didn't, in fact, disobey an order. I would have never disobeyed him. I love, this is my family. And 19 years and 14 months, I have no retirement, no healthcare benefits, nothing. I'm fighting, I've been fighting this for years. In the same case involving Seamus Lyons and Noel Nelson, they were not denied the ability to present what they had, the proof that they had in support of their claims. I went to a jury trial based on what Daniel Moore testified. Oh, there's only four claims left, Judge, and it all happened while she was still in CNET. And they did that for a reason, because within a month of my forced transfer, that's when Defendant Martin McKee filed these false statements. That's when Stephen Negrelli filed these false statements. That's when they submitted perjury against me that resulted in my termination. So by keeping this tiny little jury trial within the scope of four little things, I was warned by the judge, you will not talk about anything that occurred after your forced transfer. And they did that for a reason, because now I can't tell the jury what happened. I'm so busy being reprimanded by this judge that I will not say anything, or I will be threatened with sanctions. I'm a liar, my witnesses were not allowed to present themselves. I have a coworker, he's a dear friend of mine who retired from the state police. He's of African-American descent, also filed an EEO complaint. And he knew the chilling effect this sent across the state because of what they did to me. Yet the district court refused to let him testify. My family wasn't allowed to testify, no one. The jury had no idea what was going on because I was so busy having to hide things from them. My exhibits were left sitting in a reserve pile on an open courtroom. Everybody was going into them, accessing them. And the reason why you couldn't show that evidence from after the transfer is because the district court said that the Article 78 proceeding had established that there was a reason for your termination? Not in her motion for injunctive relief, she just indicates she failed to establish irreparable harm, and that's the most significant factor in granting injunctive relief. And in fact, there was irreparable harm. I lost my business. I started a business. I couldn't get back home. I believed in this system. I've spent my life protecting the courts of law, our justice system, the military. I've served our country, two decorated tours in Afghanistan. I gave my life, and I'm telling you I didn't disobey him. But if you make me hide the truth, then I can't tell it to the jury. I did what this district judge ordered me to do. She refused to let me question Thomas Kapisa. He was division counsel. He was the one who handed Joseph D'Amico this notice of termination, knowing that I did nothing wrong. He was the one who ordered the illegal search and seizure of my home. And my son, who wasn't even a party to this action, I have forged firearms records produced from the New York State Police saying that I sold a handgun to a gun store I've never even heard of. I hired an expert witness who presented reports to the court telling them that these are, in fact, forged documents. And yet, the district court ruled that I was a liar, that I should be sanctioned, that I needed to stop bringing these matters to the court. And on August 12, 2021, the court held a pretrial conference and turned around and said, I don't know anything about an illegal search warrant. It's in the complaint I filed six years ago, Judge. Can I ask about the illegal warrant? I mean, is the claim that the search was part of the retaliation claim? Absolutely. Or do you have a separate claim for the illegal search? The retaliation never stopped, Your Honor. So the claim is that the search was part of the retaliation. Yes, sir. And all I've asked, just give me a full and fair opportunity to litigate this. It states in case law that if evidence comes to light that wasn't available at the time of your Article 78 hearing, you have the right to present that. New evidence came to light, and I'm not being allowed to present it. I think we have that argument. You've reserved time for rebuttal, so we'll hear from you again. But let's turn to the first appellee, Mr. Moore. Thank you, Your Honor. This is an appeal following the trial of claims of gender discrimination and retaliation against New York State police and certain police members by an appellant, a former police investigator. In total, there have been 21 cases filed by the appellant arising from her appointment with and termination from the New York State police. These include eight cases filed in the court of claims, three EEOC charges, two state division complaints, two public employment relations board charges, two federal lawsuits, two state court lawsuits, one USERRA complaint, and one claim filed in the city of Batavia Small This matter, then, is the last, hopefully, in a long line of appellant's grievances against the state of New York and the New York State police arising primarily from her termination. Significantly, all of the appellant's claims alleging unlawful conduct that occurred prior to her termination have gone to trial, if not against all of the defendants that the appellant originally named. These pre-termination claims include a hostile work environment claim based on gender and retaliation claims arising from her assignment in November 2013, the temporary removal of her undercover duties in January 2014, and her transfer to the counterintelligence unit in May of 2014. After nine days of trial, and after hearing testimony from 20 witnesses and reviewing over 150 exhibits, the jury unanimously concluded that the evidence did not support any of the appellant's claims. In this appeal, appellant has provided no articulable reason why these findings should be disturbed. The appellant has claimed that the court below fingered appellees in its rulings and wrongfully excluded appellant's proposed exhibits and witnesses. In most cases, however, appellees in the court are left to guess as to which ruling she is referring to, as she's provided very few references to the record and virtually no reference at all to the trial transcript where an objection has been preserved for appeal. Where appellant has provided specific basis for an objection, for example, in her motion for a new trial or in opposing an appellee's motion for review. Well, Mr. Moore, what about what Ms. Oliver just said, that she should have been allowed to introduce evidence following the transfer? Well, Your Honor, what happened after the transfer was her termination. And her termination was essentially the court analyzed that claim by reviewing, by analyzing it under the McDonnell-Douglas formula and also by applying this court's decision in the Tuzik versus Erie County Mortar Authority. Lower court gave preclusive effect to the factual findings reached by the New York State Lease Hearing Board after an evidentiary hearing and later confirmed by the Appellant Division 4 Department. Those findings, which the court had to give preclusive effect to, included, among other things, that appellant had lied, that she made false entries in official record, and that she circumvented New York State Police policy. The hearing board concluded that appellant accepted no responsibility for her actions, was adamant about her own infallibility, and she seriously jeopardized New York State Police operations. Now, consistent with the Tuzik, the lower court next examined whether the decision reached was at least in part taken by discriminatory or retaliatory intent. At this stage, however, appellant was simply unable to offer evidence sufficient to meet her burden of demonstrating that the court's reasoning was pretextual and that, in reality, it was motivated, at least in part, by discrimination or retaliation. So it's not simply preclusion of the Article 78 proceedings. Right. Also to show that she didn't have an evidentiary basis for showing that the termination was motivated by discrimination. Absolutely correct, Judge Benaschi. The judge very carefully, it's a 112-page decision, very carefully went through the evidence that was presented to see if there was any inference. I think I understand the argument. Can I also ask about this idea about the illegal search and seizure? So she wasn't allowed to introduce evidence of that. But in fact, if that's part of her retaliation claim, why shouldn't she be allowed to introduce the evidence of the search? It wasn't her complaint, right? Well, Judge, there was a statement in her complaint about it. And the court, initially, there was a discussion of whether this was a Fourth Amendment claim. But there was no Fourth Amendment claim. As far as retaliation, the judge concluded that this, first off, this really had nothing to do with employment. So it was not employment retaliation. Most of the case law says that after termination, if there is a retaliation claim, it typically will involve situations where a company affects the claimant's employment at some other place. But this is not an illegal case. But in addition, But just to clarify that, you're saying Title VII just doesn't prohibit an employer, a public employer, from conducting an illegal search of the former employee's home because that's not something that affects their employment prospects? The Fourth Amendment would protect that, not Title VII. Right. So if it actually happened, there should be a Fourth Amendment claim, is your argument? That, Your Honor, and the fact that there's no connection, there's no causal connection between the individuals conducting the search and her earlier complaint at all. And in addition, again, the record shows that this Excuse me. What do you mean, no causal connection? I mean, they weren't the ones to whom she complained. But they could have learned about it. They could have, Your Honor, but at the summary judgment stage, there was no evidence that they were in any way connected with a complaint that she had brought some year before or so. And in addition, there is record evidence that she did consent to the search and she sunk off on it. In fact, they were simply looking for several handguns that she no longer had license to carry and was to turn over. There were a couple they couldn't find because she had put in the record the wrong serial numbers. Eventually, the whole situation was cleared up in about a month. OK. Thank you very much, Mr. York. We'll turn to the next appellee, Ms. Jocelyn. Good morning, Your Honor. May it please the court, Lisa Jocelyn on behalf of defendant appellee, Lieutenant Martin McKee. Your Honor, I'd like to step back for a moment and sort of remind the court that there's a series of undisputed facts that form the backdrop for this entire case. And these facts show a consistent theme with Ms. Oliver, and it started with her employment and it continued at the end of the trial. Ms. Oliver is very passionate, and she had an exceptional work ethic. I think that's undisputed. The problem is she always thought she was right. She made a series of serious mistakes, serious missteps, and demonstrated poor judgment at work. She disagrees with this. We understand that. But the point is the New York State Police demonstrated that this occurred. This behavior on her part was unacceptable to them. So a personnel complaint was issued against her. The IAB conducted a very thorough investigation and determined that she had violated six different regulations of the New York State Police. They recommended a penalty of 30 days. That's it, 30 days unpaid suspension and one year of probation. That was it. This thing would have been over. But Ms. Oliver refused to accept that, much like she refused to accept counseling and training along the way. She refused to believe that she had done anything wrong, despite the evidence in front of her. She demanded that formal charges be issued against her, and they were. They went to a hearing, a full hearing, two days. She had the opportunity with an attorney to present evidence and cross-examine. At the end of the hearing, she was found in violation of the charges against her and terminated. That defiance carried her through the beginning of this lawsuit and all of the other lawsuits. Well, if the original understanding was that the violations required 30 days suspension, why did the hearing result in the termination? Your Honor, I wasn't there for that, and I'm not privy to the determination as it was made. The proper forum for questioning the result of that determination was through an Article 78 proceeding. So that was not actually part of this case and not part of Lieutenant Martin McKee's claims against him. So unfortunately, I can't answer that. I apologize. But you were just saying that the New York State Police was acting reasonably and only thought that it justified a 30-day penalty. I agree, Your Honor. But then because she insisted on the formal charges being brought, it resulted in her termination. But why would they insist? Because the New York State Police doesn't like it when people insist on the formal charges? Absolutely not, Your Honor. I mean, I don't represent the New York State Police, but I will hazard a guess. Based on my review of the transcripts from that hearing, during the hearing, volumes of other evidence was presented against Ms. Oliver and demonstrated that 30-day suspension, in fact, was not enough. IAB recommended, to my understanding, IAB recommended that penalty. And I think they were being conservative in their recommendation of the penalty. She went to a hearing. More evidence was presented. Her attorney was with Ms. Oliver. They had the opportunity to fully defend and cross-examine all witnesses and present their own. And the violations are the instance where there was failure to warn about a passenger in a vehicle contacting informants from her prior assignment after she has a new assignment? Is that what the violations are? So, Your Honor, yes, those are separate. For this case, it has been fully litigated in volumes of discovery, exchange of records, and deposition transcripts that Ms. Oliver did, in fact, commit serious infractions. One of them was that she put herself at risk and those of her fellow officers during an undercover operation. It was almost the straw that broke the camel's back. At that point, they had to do something. And, Your Honor, there were other things. She had sent scathing emails about her superiors to her superiors and others that she worked with. She failed to follow the chain of command on more than one occasion. Just completely refused to follow directives that she didn't agree with. It was this approach to her work that she carried with her, Your Honor, into trial. She did not like the judge's decisions. We understand that. None of us do when the court rules against us. Ms. Oliver refused to accept it. When the motion for summary judgment, the 115-page decision thoroughly identified, detailed the examination of her claims against every single defendant, and very clearly explained what claims were dismissed and what was remaining, Ms. Oliver refused to accept it. When Ms. Oliver accuses Dan Moore of deciding the claims remaining for trial, that's completely absurd. That's not what happened at all. At the conference, the judge knew we had all read the decision, and she just asked one of the attorneys to, for the record, explain a summary of the remaining claims so we could all be on the same page to start the conference. That was it. There was no determining by Dan Moore or me about what claims were left for trial. Ms. Oliver didn't like that. So at every point leading up to the trial and during the trial, she consistently tried to introduce evidence and witness testimony that was not relevant. It was pertaining to a claim that was dismissed. It was pertaining to a claim in a totally separate case. It was not before this court at all. This was the theme of her approach to this case from day one. And your honors, it was exhaustive. It was exhausting, and it was frustrating because at every point in time, we had to help Ms. Oliver because she was pro se at this point. I totally understand that. The judge asked us to help her. I personally, and this is where I take a little bit of offense to what she says in her papers, I personally spent hours before the day of trial, during the trial, I missed lunches helping Ms. Oliver with her records on the defense. She's the plaintiff. I helped her to try to organize, assimilate, and label and introduce her records because I knew that it was better for the court.  Before, during, and after every day of trial, we were helping Ms. Oliver. Okay, I think we have that argument. Yes, your honor. Thank you very much. Okay, thank you. We'll turn back to Ms. Oliver on the middle. Thank you. I need to say something as well. After my forced transfer into Troop A, Ms. Jocelyn talks about me being so dangerous and unsafe. I worked as an undercover narcotics investigator for six years. I never, never injured anyone, never injured myself. I've conducted hundreds and hundreds of undercover narcotics investigations safely. I did everything by the letter of the law. Every single document, every paper, every accusatory instrument. The hearing, you did get a hearing on this question about whether you had followed the chain of command and whether you had contacted informants or failed to notify about the passenger and these things. Your honor. So your argument is you didn't do those things, right? Yes, your honor, and if you look at. But there was a hearing on that question and there was an article 78 proceeding. No, your honor. If you look at Stephen Negrelli's sworn testimony, it's under special appendix 18. He says specifically she has no operational duties. She is assigned strictly to an information sharing unit. He goes in and elaborates with division counsel, Lois Golan, about how I have no operational duties. Look at the, look at special appendix 10. You will see, in fact, Stephen Negrelli personally, assigned me to every search and arrest warrant raid across Western New York. I was on teams with the same law enforcement agencies. I worked with CNET. He put me on every raid, every search warrant, executing search warrants, arresting. Do you have an opportunity to make these points at a hearing? When the hearing took place, your honor, it was led by division counsel under Thomas Capisa. I tried to give them the documents. I waited for Stephen Negrelli to testify, because at that point, IAB, John Aquilina was the IAB officer. He's good friends with Stephen Negrelli. The whole investigation was a shame. So then, presumably you weren't permitted. I was not allowed. Okay, then, stop. Then after that, you had recourse, did you not? Beyond the hearing, to appeal? Your honor, I went to an Article 78 hearing. The problem was, is they looked at exactly what was there and said, Joseph D'Amico, as the final arbiter, looked at all of this and decided that this was, in fact- Well, they ruled against you, I understand that. Yes, sir. But the question is, did you have an opportunity to make your arguments? No, sir. Not even in the Article F78 proceeding? Not as it relates to retaliation. And if you look at the appellate court, they specifically wrote, the issue of retaliation is not before us, therefore- It's very different, it's a different conception as to whether or not there's a hearing and you lose, or whether or not there's no hearing, or there's not a fair hearing. Yes, sir. And then, if you don't get a fair hearing and there's a right to appeal, you can appeal that. And then you appeal that, and you get a chance for a second hearing in which they review what happened at the first hearing. And you're saying that none of that happened for you? I guess- To me, that's kind of incredible. I mean, this is like a one in a thousand case. I guess they thought that the retaliation would be heard at the district court level. But if you look at the judge's decision on her injunction, her denial of my motion for injunctive relief, her decision and order in response to summary motions, why doesn't she document that? Why will no one say that what Steven Negrelli said was the reason why I was terminated? But it was all a lie. The charges were fraudulent. I was facing a 30-day suspension. I sat there and watched my supervisor, this commissioned officer, commit perjury against me. And I had to figure out plans. Well, maybe I'll go on military orders for the 30 days. Why would you fire me? I've never been the subject of any, any disciplinary action whatsoever. Yet I have coworkers who have been arrested for strangulating their ex-lovers in a fight that while they're drunk in the car, he throws her out of the car, almost kills her. She's in the hospital and he gets a three-day suspension. And these decisions were not made at a lower level. They were made by Thomas Capisa, who was division counsel, the second in command of the state police, Kevin Gagan, Joseph D'Amico. These guys submitted false statements. I can prove it, but by the district court saying, you will not talk about anything. I obeyed her. I did exactly what she told me to do. And we tricked that jury into dismissing my claims. This is not fair. I don't need anything special. I just want a full and fair opportunity to litigate my retaliation and discrimination claims related to my illegal termination. It's never been heard, never. Okay, thank you very much, Ms. Oliver. We have your argument. The case is submitted.